**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DAVID JOVON MCDONALD,** | : | **CIVIL NO. 1:10-CV- 379** |
| | : | |
| **Petitioner,** | : | **(Judge Caldwell)** |
| **v.** | : | |
| | : | **(Magistrate Judge Carlson)** |
| **BARACK OBAMA, et al.,** | : | |
| | : | |
| **Respondents.** | : | |

## REPORT AND RECOMMENDATION

### I.     Introduction

In this habeas corpus petition we are called upon to answer two questions regarding the application of the Second Chance Act, a 2008 federal statute designed to provide prison officials with greater discretion in assisting inmates in making the transition back into society by permitting prison officials to place inmates in Residential Re-entry Centers up to 12 months before they are released from custody.

First, this petition invites us to determine whether, and to what extent, the Second Chance Act gives federal inmates a substantive right to early release to a halfway house or other non-custodial setting as they near the conclusion of their prison terms. With respect to this question, we find, consistent with the vast majority of courts, that the Act does not create a specifically enforceable right to release at any particular time. Rather, it provides guidance to prison officials in the exercise of their

longstanding statutory discretion concerning inmate placements, guidance that permits, but does not compel, earlier release to a residential setting for inmates. Accordingly, what the law requires is for prison staff to give each inmate individualized consideration for earlier residential release, but leaves that individualized assessment largely in the discretion of corrections staff. Thus, we find that the requirements of the Act are fully met where, as in this case, the evidence shows that the petitioner received a carefully tailored and individualized assessment of his suitability for placement in a Residential Re-entry Center.

Second, in this petition we consider the application of an arcane provision of the United States Constitution to this offender, who asserts that the Second Chance Act is an unconstitutional bill of attainder. For the reasons set forth below, we find that the bill of attainder clause of the United States Constitution does not apply to this inmate's request for early release into a Residential Re-entry Center.

## II.    Statement of Facts and of the Case

### A.    David Jovon McDonald

David Jovon McDonald is a 31 year-old federal inmate who is currently serving a 36 month prison term at the Federal Correctional Institution, Allenwood, following his conviction for possession of firearms by a convicted felon. (Docs. 1, and 20, Ex. 1, Attach.4-8.) McDonald  has been incarcerated at Allenwood since May 28, 2009,

having previously been housed at FCI Elkton from April, 2008 through May, 2009. ( Id. ¶ 5) McDonald's current projected release date is June 22, 2010.(Id. )

McDonald has prior convictions, and a documented history of prior drug abuse involving marijuana use since the age of 16. (Id. Ex. 1, Attach.6-8.) He successfully completed a drug education program at FCI Elkton. (Id.) While incarcerated, McDonald has been cited and disciplined by prison officials for institutional misconduct. Specifically, McDonald was disciplined for threatening bodily harm and for telephone abuse. (Id., Ex. 1, Attach. 4 and 5.)

## B.    The Second Chance Act and BOP Implementing Guidance

While McDonald  was serving this federal  sentence, in April of 2008, the Second Chance Act of 2007, Pub. L. No. 110-199, went into effect. The Act contains several provisions which are designed to aid prisoners in their transition back into society. For example, the Act authorizes the Bureau of Prisons to place certain inmates in Residential Re-entry Centers (RRC) for as much as one year at the end of their prison terms to aid them in their readjustment into society. See 18 U.S.C. § 3624(c)(1).[1] While McDonald has been in federal custody the Bureau of Prisons has

───────────────

[1]18 U.S.C. § 3624(c)provides as follows:

**( c ) Prerelease custody.–**

**(1) In general.**--The Director of the Bureau of Prisons shall, to the extent practicable, ensure that a prisoner serving a term of imprisonment spends a portion

adopted a series of policies, practices and procedures which govern inmate placement and custody. (Doc. 20, Ex.1, Attach. 2-3.) These policies, in part, speak to the issue of Residential Re-entry Centers (RRC) placements of inmates in the year prior to their release dates.

These prison policies, which are attached to the response to this petition, specifically direct that as a result of the Second Chance Act: (1) RRC placements were increased to a maximum of twelve months; (2) RRC placement determinations are to be made on an individualized basis using the criteria set forth at 18 U.S.C. §3621(b);

---

of the final months of that term (not to exceed 12 months), under conditions that will afford that prisoner a reasonable opportunity to adjust to and prepare for the reentry of that prisoner into the community. Such conditions may include a community correctional facility.

**(2) Home confinement authority.**--The authority under this subsection may be used to place a prisoner in home confinement for the shorter of 10 percent of the term of imprisonment of that prisoner or 6 months.

**(3) Assistance.**--The United States Probation System shall, to the extent practicable, offer assistance to a prisoner during prerelease custody under this subsection.

**(4) No limitations.**--Nothing in this subsection shall be construed to limit or restrict the authority of the Director of the Bureau of Prisons under section 3621

18 U.S.C. § 3624(c).

and, (3) sentencing court orders, recommendations or requests directing an inmate's placement in an RRC were not binding on the Bureau of Prisons.

The Bureau of Prisons policies governing implementation of the Act further specifically instructed prison staff that all inmates must now be reviewed for pre-release RRC placements 17-19 months before their projected release dates, and set forth the five factors under 18 U.S.C. § 3621(b) which must be considered when determining RRC placement dates. (Id.) These written procedures further state that, "the Act requires staff to ensure that each pre-release RRC placement decision is 'of sufficient duration to provide the greatest likelihood of successful reintegration into the community.'" (Id. Ex. 1, Attach. 2 ) Thus, staff were admonished that they "must approach every individual inmate's assessment with the understanding that he/she is now eligible for a maximum of 12 months pre-release RRC placement." (Id., emphasis in original.) The guidance provided to prison staff further states as follows: "While the Act makes inmates eligible for a maximum of 12 months pre-release RRC placements, Bureau experience reflects inmates' pre-release RRC needs can usually be accommodated by a placement of six months or less. Should staff determine an inmate's pre-release RRC placement may require greater than six months, the Warden must obtain the Regional Director's written concurrence before submitting the placement to the Community Corrections Manager." (Id.) Therefore, the Bureau of

Prisons policy guidance implementing the Act accomplishes three goals: First, it mandates consideration of 12 month residential re-entry center programs for all inmates. Second, while mandating this individualized consideration, the policy notes that for many prisoners "inmates' pre-release RRC needs can usually be accommodated by a placement of six months or less." Therefore, the policy contains a third critical component requiring Regional Director approval for RRC placements exceeding 6 months.

**C.**      <u>**Application of The Second Chance Act and Implementing Guidance to McDonald's RRC Placement**</u>

It is against this statutory regulatory and administrative background that prison officials considered an RRC placement for David Jovon McDonald. That consideration began in the Spring of 2009, and involved separate, individualized assessments of McDonald's release by prison staff at FCI Elkton and later at FCI Allenwood.

This process began on April 2, 2009, when McDonald met with his Unit Team at FCI Elkton for his program review. (Doc. 20, Ex. A,. ¶ 9 Attach.4 to Ex. A). At that time, McDonald's Unit Team considered him for RRC placement. This initial review was documented by the Bureau of Prisons and entailed a specifically tailored assessment of McDonald's needs, one which took into account both McDonald's need

for services, the public safety, and the necessity of the BOP to manage its inmate population. (Id.) The assessment also took into account the fact that McDonald had engaged in misconduct while in prison, including receiving an incident report for threatening bodily harm. (Id.)  After taking all of these factors into consideration, the Unit Team at FCI Elkton recommended a placement of 45-60 days, which they determined was a sufficient duration to provide McDonald with the greatest likelihood of successful reintegration into the community. (Id.) In making this 45-60 day recommendation, the Unit Team at FCI Elkton expressly based its decision on an individual assessment of the criteria set forth in the Second Chance Act and Bureau of Prisons' program statements implementing that Act. (Id.)

On May 9, 2009, the Unit Team at FCI Elkton gave McDonald's case further individualized attention when it reconsidered McDonald's request for RRC placement. (Id., Ex. A¶ 10 Attach. 5.)  After completing this review, the FCI Elkton Unit Team once again recommended an RRC placement of 45-60 days, (id.), a decision which prison officials communicated to McDonald on May 11, 2009. (Id.)    In connection with this initial RRC placement recommendation, an "Institutional Referral for RRC Placement" form was completed by prison staff. (Id. Ex. A ¶ 11 Attach. 6.) This form also reflects a specifically-tailored evaluation of McDonald's needs, noting that this

particular RRC placement was being recommended to assist McDonald in accruing release funds, employment, and to re-establish family ties. (Id.)

The process of individually assessing McDonald's RRC placement continued once this inmate was transferred to FCI Allenwood. On June 19, 2009, after McDonald was transferred to FCI Allenwood, another program review was conducted for him. (Id. Ex. A ¶ 12, Attach. 7.)This review was reflected in an inmate skills development plan, which thoroughly and individually documented McDonald's criminal history, institutional conduct, social development, training programs, social history and family background. (Id.) This June 19, 2009 program review noted that McDonald was recommended and referred for RRC placement by his previous Unit Team at FCI Elkton. After reviewing McDonald's social history, criminal record, and institutional background, as well as his needs and available resources, McDonald's FCI Allenwood Unit Team concurred with the recommendation and completed another "Institutional Referral for RRC Placement" on June 24, 2009. (Id.)

On the basis of these assessments, McDonald has received an April 5, 2010 placement date from the Bureau of Prisons (Id. Ex. A ¶ 13 Attach. 8.) McDonald has challenged this placement decision through the Bureau of Prisons administrative review process, and received a response from the Regional Director of the Bureau of Prisons on November 18, 2009, denying this request. (Id.)

While McDonald's administrative appeal was denied, the response he received further confirmed that his case had received individual attention from prison officials. As the Regional Director explained to McDonald when considering his appeal:

> A review of your classification materials reveals you are serving a 36 month term with a June 12, 2010, projected release date, for Felon in Possession of a Firearm. Your Unit Team considered your individual situation and transitional needs pursuant to the above criteria on April 3, 2009, and reconsidered your situation on May 9, 2009. As components of your individualized review, the team considered your housing needs, education, work history, vocational skills, financial situation, institutional adjustment and community resources. Following their reconsideration of your transitional needs, it was determined that a 45-60 day RRC placement was of sufficient time to provide you the greatest likelihood of successful reintegration into the community. You have been approved for RRC placement on April 5, 2010. Accordingly, your appeal is denied.

(Id.)

### E.    McDonald's Habeas Petition

On October 5, 2009, McDonald filed this petition for writ of habeas corpus in the United States District Court for the District of Columbia. (Doc. 1.) The case was transferred to the United States District Court for the Middle District of Pennsylvania, where McDonald is presently confined, for consideration.

In his petition McDonald advanced two somewhat inconsistent claims. First, McDonald sought to invoke the Second Chance Act, and challenged the prison's decision to deny him earlier release consideration under the Second Chance Act,

arguing that the actions of prison personnel are inconsistent with the law. (Doc. 1.) Having first sought to invoke the Act, McDonald then requested in his petition that the Court find that the Second Chance Act is an unconstitutional bill of attainder and violates equal protection, since it provides greater benefits to elderly inmates under a pilot program for elderly non-violent offenders.(Id.) These issues have been fully briefed by the parties (Docs. 1, 19 and 20) and are now ripe for disposition. For the reasons set forth below, it is recommended that the Court deny this petition because it fails on its merits.

### III. Discussion

#### A. McDonald Has Received Individualized Consideration of His RRC Placement and Therefore is Not Entitled to Further Relief Under the Second Chance Act.

At the outset, in this petition McDonald seeks to invoke the Second Chance Act as grounds for habeas relief, arguing that he is entitled by statute to relief in the form of an earlier placement in a Residential Re-entry Center. However, given the standard of review which we believe should apply to these matters, we conclude that McDonald has not carried his burden of establishing that this discretionary decision by the Bureau of Prisons violated any rights guaranteed to him by the Constitution or laws of the United States. Therefore, we recommend that this claim be denied on its merits.

At the outset, it is clear that McDonald's petition does not raise any concerns of a Constitutional dimension. Nor can McDonald rely upon Constitutional concerns to challenge this RRC placement decision since it is well established that the United States Constitution does not confer any right upon an inmate to any particular custody or security classification. Moody v. Daggett, 429 U.S. 78, 88 (1976); Montanye v. Haymes, 427 U.S. 236, 242 (1976). Thus, inmates do not have a liberty interest in retaining or receiving any particular security or custody status "[a]s long as the [challenged] conditions or degree of confinement is within the sentence imposed ... and is not otherwise violative of the Constitution." Id.

Similarly, it has long been recognized that the mere fact of a prison transfer, standing alone, does not constitute cruel and unusual punishment in violation of the Eighth Amendment to the Constitution. See, e.g., Hassain v. Johnson, 790 F.2d 1420 (9th Cir. 1986); Serrano v. Torres, 764 F.2d 47 (1st Cir. 1985). Thus, even inmate transfers to facilities far from their homes do not rise to the level of cruel and unusual punishment. See, e.g., Gov't of Virgin Island v. Gereau, 592 F.2d 192 (3d Cir. 1979)(transfer from Virgin Islands to mainland); Rodriguez-Sandoval v. United States, 409 F.2d 529 (1st Cir. 1969)(transfer from Puerto Rico to Atlanta). In short, well-settled law establishes that prisoners have no inherent constitutional right to placement in any particular prison, such as a Residential Re-entry Center, to any  security

classification, or to any particular housing assignment. See Olim v. Wakinekona, 461 U.S. 238, 245 (1983); Meachum v. Fano, 427 U.S. 215 225 (1976); Montanye, 427 U.S. at 242; Bulger v. U.S. Bureau of Prisons, 65 F.3d 48 (5thCir. 1995); Marchesani v. McCune, 531 F.2d 459 (10th Cir.1976).

Rather, McDonald's sole avenue for substantive relief lies through the Second Chance Act itself. With respect to habeas claims premised on the Act, as we have noted, in April of 2008, the Second Chance Act of 2007, Pub. L. No. 110-199, went into effect. This act contains several provisions which are designed to aid prisoners in their transition back into society. For example, the Act authorizes the Bureau of Prisons to place certain inmates in Residential Re-entry Centers for up to one year at the end of their prison terms to aid their readjustment into society. See 18 U.S.C. § 3624(c)(1).[2]

---

[2]18 U.S.C. § 3624(c) provides as follows:

**( c ) Prerelease custody.**–

**(1) In general.**--The Director of the Bureau of Prisons shall, to the extent practicable, ensure that a prisoner serving a term of imprisonment spends a portion of the final months of that term (not to exceed 12 months), under conditions that will afford that prisoner a reasonable opportunity to adjust to and prepare for the reentry of that prisoner into the community. Such conditions may include a community correctional facility.

**(2) Home confinement authority.**--The authority under this subsection may be used to place a prisoner in home confinement for the shorter of 10 percent of the

While the Act, promotes policies assisting inmates in reintegration into society, nothing in the Act is mandatory, and the Act does not compel the Bureau of Prisons to provide particular inmates with a specific community confinement or home detention placements. Quite the contrary, the statutory text makes it clear that prison officials retain their broad discretion in placing, housing, transferring and classifying inmates. Thus, 18 U.S.C. § 3624(c)(4) clearly states that the Act in no way restricts the broad discretion conferred upon the Bureau of Prisons under 18 U.S.C. § 3621 to make decisions on how best to house inmates, providing that: "Nothing in this subsection shall be construed to limit or restrict the authority of the Director of the Bureau of Prisons under section 3621". Section 3621, in turn, broadly reaffirms the discretion of prison officials in this field to make appropriate prison placement

---

term of imprisonment of that prisoner or 6 months.

**(3) Assistance.**--The United States Probation System shall, to the extent practicable, offer assistance to a prisoner during prerelease custody under this subsection.

**(4) No limitations.**--Nothing in this subsection shall be construed to limit or restrict the authority of the Director of the Bureau of Prisons under section 3621

18 U.S.C. § 3624(c).

decisions based upon five statutory factors set forth in 18 U.S.C. § 3621(b). [3]

Similarly, while the Second Chance Act amended 42 U.S.C. § 17541 to encourage the Bureau of Prisons to examine early release and social reintegration for certain offenders, the Act expressly reaffirms that decisions relating to which offenders may qualify for these programs involve assessments that rest in the sound discretion of the Bureau of Prisons. See 42 U.S.C. §§ 17541(a)(2) and (g)(5).

_____

[3] 18 U.S.C. § 3621(b) provides:

(b) Place of imprisonment.--The Bureau of Prisons shall designate the place of the prisoner's imprisonment. The Bureau may designate any available penal or correctional facility that meets minimum standards of health and habitability established by the Bureau, whether maintained by the Federal Government or otherwise and whether within or without the judicial district in which the person was convicted, that the Bureau determines to be appropriate and suitable, considering-

(1) the resources of the facility contemplated;
(2) the nature and circumstances of the offense;
(3) the history and characteristics of the prisoner;
(4) any statement by the court that imposed the sentence--
    (A) concerning the purposes for which the sentence to imprisonment was determined to be warranted; or
    (B) recommending a type of penal or correctional facility as appropriate; and,
(5) any pertinent policy statement issued by the Sentencing Commission pursuant to Section 994(a)(2) of title 28 . . . Any order, recommendation, or request by a sentencing court that a convicted person serve a term of imprisonment in a community corrections facility shall have no binding effect on the authority of the Bureau under this section to determine or change the place of imprisonment of that person.

Indeed, as it relates to inmate community confinement decisions, the Second Chance Act speaks directly to the discretion retained by the Bureau of Prisons in 18 U.S.C. § 3624(c)(1) which provides as follows:

> **( c ) Prerelease custody.**–
>
> **(1) In general.**--The Director of the Bureau of Prisons shall, to the extent practicable, ensure that a prisoner serving a term of imprisonment spends a portion of the final months of that term (not to exceed 12 months), under conditions that will afford that prisoner a reasonable opportunity to adjust to and prepare for the reentry of that prisoner into the community. Such conditions <u>may</u> include a community correctional facility.

18 U.S.C. § 3624(c)(1)(emphasis added).

The use of the word "may" in § 3624, has led courts to consistently hold that the Act creates no absolute, enforceable legal right to a 12- month RRC placement for any prisoner. <u>See, e.g.</u>, <u>O'Hara v. Rios</u>, No. 08-5160, 2009 U.S. Dist. LEXIS 90243 (D. Minn. Sept. 28, 2009); <u>McGee v. Thomas</u>, No. 09-455, 2009 U.S. Dist. LEXIS 62617 (D. Ore. July 22, 2009). Rather, what is required by the Act is a showing that the Bureau of Prisons engaged in an individualized determination of each inmate's RRC placement, using the statutory factors set forth in the law. <u>Smith v. Sanders</u>, No. 09-3083, 2009 U.S. Dist. LEXIS 82265 (C.D. Cal. July 31, 2009).

Moreover, in considering whether the Bureau of Prisons has properly exercised its broad discretion in this field, over the past year courts have frequently examined the Bureau of Prisons policy statements implementing the Act. These policy statements: (1) note that many inmates can be successfully reintegrated into society in 180 days or less: and, (2) require regional director approval for 12-month RCC placements. Much recent litigation in this field has focused on the issue of whether this policy guidance violates the Second Chance Act by creating unwarranted institutional and bureaucratic obstacles to such 12-month placements. As to this issue, courts are divided.

The majority view, reflected in numerous trial and appellate court decisions, holds that the Bureau of Prisons' requirement of regional director approval, and the agency's stated view that many inmates can have their needs meet through 180-day RRC placements, do not violate the Act. See, e.g., Miller v. Whitehead, 527 F.3d 752,755-58 (8th Cir. 2008); Wires v. Bledsoe, No. 09-2247, 2010 WL 427769 (M.D.Pa. Feb. 3, 2010)(citing Torres v. Martinez, No. 09-CV-1070 (M.D.Pa. Aug.12, 2009)); Fleischi v. Outlaw, No. 09-79, 2009 U.S.Dist. LEXIS 99306 (E.D. Ark. Oct. 26, 2009); O'Hara v. Rios, No. 08-5160, 2009 U.S. Dist. LEXIS 90243 (D. Minn. Sept. 28, 2009); Holland v. Bureau of Prisons, No. 08-3960, 2009 WL 2872835 (D.S.C. Sept. 2, 2009); Smith v. Sanders, No. 09-3083, 2009 U.S. Dist. LEXIS 82265

(C.D. Cal. July 31, 2009); Yanucci v. Stansberry, No. 08-561, 2009 WL 2421546 (E.D.Va. July 28, 2009);  McGee v. Thomas, No. 09-455, 2009 U.S. Dist. LEXIS 62617 (D. Ore. July 22, 2009); Sessel v. Outlaw, No. 08-212, 2009 WL 1850331 (E.D. Ark. June 25, 2009); Stanko v. Rios, No. 08-4991, 2009 WL 1303969 (D. Minn. May 8, 2009); Somerville v. DeWalt, No. 09-68, 2009 U.S.Dist. LEXIS 37454 (E.D. Ky. May 1, 2009);  Snyder v. Angelini, No. 07-3073, 2008 U.S. Dist. LEXIS 86460 (E.D.N.Y. Oct. 27, 2008). This view has been adopted by at least one court in this district.  Wires v. Bledsoe, No. 09-2247, 2010 WL 427769 (M.D.Pa. Feb. 3, 2010)(citing Torres v. Martinez, No. 09-CV-1070 (M.D.Pa. Aug.12, 2009))(Munley, J.)

Recognizing the broad discretion expressly conferred  to the Bureau of Prisons by statute, these cases consistently hold that the requirement of regional director approval for 12-month RRC placements, and the various agency statements expressing an institutional view that RRC placements of 6 months or less are generally adequate for most inmates, do not violate the Act. Rather, these policies simply reflect the Bureau of Prisons' exercise of its discretion in implementing the Act, an Act which simply provides that prison officials "may" use community corrections  facilities for up to 12 months to aid inmates in their return to society. Id. Therefore, these cases find nothing fundamentally offensive about these agency policy preferences, provided that

each inmate receives the individualized consideration of this RRC placement called for by the Act. Id.

Two cases take a different view. Krueger v. Martinez, 665 F.Supp.2d. 477 (M.D. Pa. 2009); Strong v. Schultz, 599 F.Supp.2d 556 (D.N.J. 2009). In Strong and Krueger, the district courts found that: (1) the agency requirement of prior regional director approval for 12-month RCC placements; and, (2) the agency's stated position that "inmates' pre-release RRC needs can usually be accommodated by a placement of six months or less", so restrict inmate access to the 12-month RRC programs permitted under the Second Chance Act that they constitute an abuse of discretion by the Bureau of Prisons. Id. In Krueger, the district court also went on to note another shortcoming in the agency's implementation of the Act, observing that in making its particular RRC placement the agency appeared to have failed to consider a statutory requirement under 42 U.S.C. § 17541 that the Bureau of Prisons use early RRC placements to create incentives for inmates to participate in educational programs. Krueger v. Martinez, 665 F.Supp.2d. 477, 484-86 (M.D. Pa. 2009). Citing these concerns, these two courts granted habeas petitions, but only permitted a very limited form of relief, directing the agency to simply reexamine its decision without taking into consideration the general agency policy guidance which the courts found to violate the goals of the Act.

While these two cases express this view with great force, it is recommended that the Court adopt the majority view in terms of its framework for analysis of this habeas petition. At the outset, imposing this heightened scrutiny to these prison placement decisions can create a legal and analytical dilemma for reviewing courts in terms of defining the proper scope of judicial review in an area committed to agency discretion. This dilemma is aptly described by the one of the leading decisions in this field, <u>Miller v. Whitehead</u>, <u>supra</u>, which succinctly identified the dangers which may arise if agency determinations regarding how to implement statutes concerning inmate prison assignments which provide for the exercise of substantial discretion are not given due deference. As the Court noted:

> Taken to its logical conclusion, the argument advanced by the inmates would require the BOP to consider daily requests for transfer to an RRC from every inmate in a facility, and to deny such requests only after an individualized consideration of each inmate's request and the five statutory factors. We agree . . . that "Congress surely did not intend such a result." <u>See Muniz v. Sabol</u>, 517 F.3d 29, 36 n. 14 (1st Cir.2008). "Even if a statutory scheme requires individualized determinations, ... the decisionmaker has authority to rely on rulemaking to resolve certain issues of general applicability unless Congress clearly expresses an intent to withhold that authority." <u>Lopez v. Davis</u>, 531 U.S. 230, 243-44,(2001) (internal quotation omitted).

<u>Miller,</u> 527 F.3d at 757.

These dangers may not have been fully addressed by the two cases which granted habeas relief, since neither court discussed <u>Miller</u>, the leading appellate court decision in this field, in reaching their conclusions.

Furthermore, we agree with the majority of courts which have considered this statutory text, that the Second Chance Act does not have the type of force that <u>Strong</u> and <u>Krueger</u> suggest. While the Act authorizes 12-month RRC placements by the Bureau of Prisons, it does not mandate them. Instead, the Act expressly and repeatedly emphasizes that the Bureau of Prisons retains full discretion in identifying when and how inmates are placed at RRCs. <u>See, e.g.</u>, 18 U.S.C. §§ 3621(b), 3624(c)(1) and (4); 42 U.S.C. §§ 17541(a)(2) and (g)(5).

Moreover, while we recognize the force of institutional inertia which concerned the court in <u>Krueger</u>, and the fact that these policy prescriptions will restrict the number of inmates who receive this 12-month program, any exercise of discretion yields this result for some inmates. Yet, Congress expressly authorized the exercise of this discretion by the Bureau of Prisons when implementing this program. <u>See, e.g.</u>, 18 U.S.C. §§ 3621(b), 3624(c)(1) and (4); 42 U.S.C. §§ 17541(a)(2) and (g)(5). Furthermore, the requirement of regional director approval for 12-month placements in RRCs and limiting extended access to these programs is rationally related to one of the statutory factors which govern prison placements; namely, the allocation of limited

available prison resources. See 18 U.S.C. 3621(b). Without centralized coordination of these placements, individual institutions applying guidance in different ways could quickly exhaust available inmate housing. Thus, the various competing demands for these placements is a factor which strongly cautions in favor of some centralized assessment of extended RCC placement requests.

Finally, while we agree with the Miller court that individualized assessments of specific RRC placement decisions is not a task well-suited for the courts, we also note that the broader question of the Bureau of Prisons' overall implementation of its discretion under the Second Chance Act is an issue which is more appropriately considered in some other forum. In that regard, the Act expressly calls for legislative oversight of this process, mandating that the Bureau of Prisons prepare and submit to Congress annual reports documenting the way in which it exercises the discretion conferred upon it by Congress in this field. See 42 U.S.C. § 17541(d). While this Congressional oversight is not a reason to forego our responsibilities here, it is a factor which suggests that in fulfilling our responsibility we should focus on ensuring that each inmate receives the individualized consideration called for by the law, and may leave the broader public policy assessment of how well prison policies meet Congressional expectations to another forum.

In short, adopting a view which calls for a particularized analysis and assessment of the wisdom Bureau of Prisons policy guidance in the area of RRC placements could draw the courts into an individualized judicial assessment of every inmate's transfer request, a result Congress could not have intended. Miller, 527 F.3d at 757. Moreover, many of these policies, and particularly the policy requiring centralized review of extended RRC placements, are rationally related to institutional needs that are expressly delegated to the Bureau of Prisons. Further, to the extent that there is a need to engage in an overall assessment of how these policies are being implemented, the Second Chance Act clearly contemplates that this review will be done primarily through Congressional oversight. Therefore, all of these statutory considerations weigh in favor of the majority view expressed by the federal courts, which calls upon the courts to limit judicial review in this field to making an independent assessment that the Bureau of Prisons engaged in an individualized determination of each inmate's placement, using the statutory factors set forth in the law. Smith v. Sanders, No. 09-3083, 2009 U.S. Dist. LEXIS 82265 (C.D. Cal. July 31, 2009).

Adopting this standard of review we believe that the record of these proceedings shows that McDonald's request received individualized consideration at the prison. This process began on April 2, 2009, when McDonald met with his Unit Team at FCI

Elkton for his program review. (Doc. 20, Ex. A,. ¶ 9 Attach.4 to Ex. A). At that time, McDonald's Unit Team considered him for RRC placement in a well-documented and specifically tailored assessment of McDonald's needs, one which took into account both McDonald's need for services, the public safety, and the necessity of the BOP to manage its inmate population. (Id.) The assessment also considered the fact that McDonald had engaged in misconduct while in prison, including receiving an incident report for threatening bodily harm. (Id.) After taking all of these factors into consideration, the Unit Team at FCI Elkton recommended a placement of 45-60 days, a decision based on an individual assessment of the criteria set forth in the Second Chance Act and Bureau of Prisons' program statements implementing that Act, and a decision which they determined was sufficient to provide McDonald with the greatest likelihood of successful reintegration into the community. (Id.) On May 9, 2009, the Unit Team at FCI Elkton gave McDonald's case further individualized attention when it reconsidered McDonald's request for RRC placement, and once again recommended an RRC placement of 45-60 days.

The process of individually assessing McDonald's RRC placement continued once this inmate was transferred to FCI Allenwood. On or about June 19, 2009, after McDonald was transferred to FCI Allenwood, another program review was conducted for him. (Id. Ex. A ¶ 12, Attach. 7.)This review was reflected in an inmate skills

development plan, which thoroughly and individually documented McDonald's criminal history, institutional conduct, social development, training programs, social history and family background. (Id.) This June 19, 2009 program review noted that McDonald was recommended and referred for RRC placement by his previous Unit Team at FCI Elkton. After reviewing McDonald's social history, criminal record, and institutional background, as well as his needs and available resources, McDonald's FCI Allenwood Unit Team concurred with the recommendation and completed another "Institutional Referral for RRC Placement" on June 24, 2009. (Id.)

Finally, McDonald's case received individual attention from the Regional Director of the Bureau of Prisons, who explained to McDonald when considering his appeal of this decision that:

> A review of your classification materials reveals you are serving a 36 month term with a June 12, 2010, projected release date, for Felon in Possession of a Firearm. Your Unit Team considered your individual situation and transitional needs pursuant to the above criteria on April 3, 2009, and reconsidered your situation on May 9, 2009. As components of your individualized review, the team considered your housing needs, education, work history, vocational skills, financial situation, institutional adjustment and community resources. Following their reconsideration of your transitional needs, it was determined that a 45-60 day RRC placement was of sufficient time to provide you the greatest likelihood of successful reintegration into the community. You have been approved for RRC placement on April 5, 2010. Accordingly, your appeal is denied.

Moreover, even if the Court examines this decision in light of the policy concerns which inspired the heightened standard of review adopted in <u>Krueger v. Martinez</u>, 665 F.Supp.2d. 477 (M.D. Pa. 2009), this particular placement decision still appears to meet the requirements set by law. At the outset, it is evident that this decision involved a specifically tailored, and individualized assessment of the needs of inmate McDonald, an assessment that was thoroughly documented by prison officials at two separate institutions. Furthermore, the prisons' judgments with respect to McDonald also appear to have considered the importance of RRC placements as a means of creating incentives for inmates to participate in educational programs, an issue that the court in <u>Krueger</u> specifically instructed prison officials to consider.

In this case, however, McDonald had a record of institutional misconduct which included threats of bodily harm to others. This immutable fact limits the application of <u>Krueger</u> to McDonald's case. Inmates, like McDonald, who engage in threatening behavior inside prison walls seem singularly ill-suited for the special incentives that the <u>Krueger</u> court cautioned the Bureau of Prisons to consider. Therefore, for this inmate, whose institutional record is marked by past threats, <u>Krueger</u> simply does not provide good grounds for further habeas relief to this inmate. In short, regardless of the standard of review employed here, an assessment of the RRC placement decision in this case leads to the firm conviction that this decision represented an individualized

assessment of the needs of this prisoner, which is all that the law requires, and all that an inmate can demand.

While we reach this result in this particular case, we note that an individualized assessment is required, both by law and by prison policies which unequivocally state that prison officials: "<u>must</u> approach every individual inmate's assessment with the understanding that he/she is now <u>eligible</u> for a maximum of 12 months pre-release RRC placement." We, therefore, urge prison officials to continue to remain mindful of the standards which they have set for themselves, and which Congress has set for them, as they ensure that all inmates receive, and understand that they are receiving, an individualized assessment of their needs.

### B. McDonald's Constitutional Attacks Upon the Second Chance Act Are Without Merit

Having initially relied upon the Second Chance Act as a basis for habeas relief in his petition (Doc. 1), McDonald then–paradoxically–attacks the statute in his petition alleging that the Act is an unconstitutional bill of attainder and violates equal protection. (<u>Id.</u>) In considering these claims, we note at the outset  that when another related provision of this federal law which permitted sentence reductions for specific classes of inmates was similarly challenged as a bill of attainder and violative of equal protection principles, that challenge was flatly rejected by a district court. <u>Stanko v.</u>

<u>Cruz</u>, No. 08-856, 2008 WL 4849025 (D. Minn. Nov. 6, 2008) (rejecting constitutional challenges to the Bureau of Prisons residential drug abuse program).

We find this reasoning persuasive when extended to the constitutional challenges advanced by McDonald here. At the outset, with respect to McDonald's assertion that the Second Chance Act constitutes an unlawful bill of attainder:

> [W]hich is forbidden under Article I, § 9 of the U.S. Constitution [we note that] [s]uch a bill occurs where Congress, by a legislative act, imposes punishment against a particular person or group without trial. The rationale is that, because trial and punishment are committed to judicial process, Congress cannot usurp the judicial role by inflicting punishment directly. See <u>United States v. Van Horn</u>, 798 F.2d 1166, 1168 (8th Cir.1986). [In contrast] [w]here a person is convicted for a crime in accordance with judicial process, statutes that prescribe the punishment for the crime are not bills of attainder, as such statutes do not usurp the judicial role. <u>Van Horn</u>, 798 F.2d at 1168. And where a statute withholds a benefit or privilege, the statute does not implicate punishment and therefore cannot be a bill of attainder. See <u>Jensen v. Heckler</u>, 766 F.2d 383, 386 (8th Cir.1985).

<u>Id.</u>, 2008 WL 4849025, *2-3.

Since the essence of the "Bill of Attainder Clause, [is that] legislatures are forbidden to enact '[l]egislative acts, no matter what their form, that apply either to named individuals or to easily ascertainable members of a group in such a way as to inflict punishment on them without a judicial trial,' <u>United States v. Brown</u>, 381 U.S. 437, 448-49,(1965)." <u>Artway v. Attorney General of State of N.J.</u>,81 F.3d 1235, 1253

(3d. Cir. 1996), this constitutional protection has only a very limited application to administrative policies in a prison setting. In fact, the United States Court of Appeals for the Third Circuit has repeatedly acknowledged the very limited role of this constitutional provision in the prison setting and has declined invitations to extend the Bill of Attainder clause to various correctional policies and practices, finding that those policies were not designed to inflict punishment without trial on any selected class of persons. Myrie v. Commissioner N.J. Dep't. Of Corrections, 267 F.3d 251 (3d Cir. 2001)(inmate commissary surcharge not a bill of attainder); Artway v. Attorney General of State of N.J., supra, (sex offender registration statute is not a bill of attainder).

These principles are fully applicable here, and are fatal to McDonald's bill of attainder argument. The provisions of the Second Chance Act which the petitioner attacks cannot fairly be characterized as measures that single him out in a punitive fashion without a trial. Quite the contrary, these provisions are clearly rehabilitative in nature, and are intended to help inmates return to society rather than punish prisoners. The mere fact that McDonald cannot take advantage of all of these benefits does not convert these remedial measures into a punitive bill of attainder.

Furthermore, McDonald's equal protection claim also fails here. The apparent premise behind this equal protection challenge is that the Second Chance Act contains

a separate provision, an elderly inmate early release pilot program authorized by Congress in 42 U.S.C. § 17541(g), which discriminates against younger inmates like McDonald based upon age and, therefore, is alleged to be unconstitutional. While this pilot program certainly draws distinctions between inmates based, in part, on age this fact alone is not dispositive of an equal protection claim. Prison policies frequently are grounded, in part, on age-based distinctions. Yet, such age-based prison policy-making has routinely been upheld by the courts. See, e.g., Brian B. ex rel. Lois B. v. Commonwealth of Pennsylvania Dep't. of Education, 230 F.3d 582 (3d Cir. 2000); Marshall v. Federal Bureau of Prisons, 518 F.Supp.2d. 190 (D.D.C. 2007); Little v. Terhune, 200 F.Supp.2d. 445 (D.N.J. 2002). These cases have traditionally judged age-based penological policies using a rational relationship test, holding that:

> "[I]f a law neither burdens a fundamental right nor targets a suspect class, we will uphold the legislative classification so long as it bears a rational relationship to some legitimate end." Romer v. Evans, 517 U.S. 620, 631(1996). "In the ordinary case, a law will be sustained if it can be said to advance a legitimate government interest, even if the law seems unwise or works to the disadvantage of a particular group, or if the rationale for it seems tenuous." Romer, 517 U.S. at 632. Indeed, under rational basis review, legislation enjoys a presumption of validity, and the plaintiff must negate every conceivable justification for the classification in order to prove that the classification is wholly irrational. See Federal Communications Comm'n v. Beach Communications, 508 U.S. 307, 314-15, (1993).

Brian B. ex rel. Lois B. v. Commonwealth. of Pennsylvania Dept. of Education, 230 F.3d 582, 586 (3d Cir. 2000). Applying this deferential standard of review many inmate programs and policies which are grounded, in part, on considerations relating to the age of inmates have been sustained by the courts as rational practices which enjoy a presumption of validity. See, e.g., Brian B. ex rel. Lois B. v. Commonwealth of Pennsylvania Dep't. of Education, supra; Marshall v. Federal Bureau of Prisons, supra; Little v. Terhune, supra.

Judged against these benchmarks, the elderly inmate early release pilot program authorized by Congress under 42 U.S.C. § 17541(g) "bears a rational relationship to some legitimate end," Romer v. Evans, 517 U.S. 620, 631(1996), and, therefore, is entitled to "a presumption of validity". Brian B. ex rel. Lois B., 230 F.3d at 586. Indeed, this pilot program is rationally related to at least two clearly legitimate, and immutable, penological interests. First, the program recognizes the reality that the recidivism rate of elderly offenders is significantly lower than that of more youthful violators. Thus, the policy promotes early release consideration for the segment of the inmate population which, as a whole, has the lowest rate of recidivism, and, therefore, presents the least risk to public safety. Yet, while focusing on this segment of the inmate population the pilot program does not lose sight of the importance of protecting the public. Therefore, it provides that age is only one factor to be considered by the

Bureau of Prisons in making placement decisions for this program, and expressly provides that federal prison officials must also independently and individually assess public safety factors relating to each inmate considered for this pilot project before enrolling an inmate in this program.

Moreover, while promoting this legitimate end, the pilot program also satisfies another important, and practical, goal. It recognizes that an aging, elderly inmate population creates a disproportionately high cost in terms of housing and medical care expenses. The pilot program then addresses this second legitimate concern by identifying those elderly inmates who present the least risk of recidivism, and authorizing their early release from custody, removing these inmates whose continued incarceration presents unique social and financial costs from the prison census.

Since the pilot program authorized by Congress under 42 U.S.C. § 17541(g) clearly bears a rational relationship to multiple, legitimate ends, it is entitled to a presumption of validity and withstands constitutional scrutiny on equal protection grounds. Therefore, McDonald's equal protection challenge to this statute must fail.

IV.  **Recommendation**

Accordingly, for the foregoing reasons, upon consideration of this Petition for Writ of Habeas Corpus filed pursuant to 28, United States Code, § 2241,  IT IS

RECOMMENDED that the Petition be DENIED, and that a certificate of appealability should not issue. The Petitioner is further placed on notice that pursuant to Local Rule 72.3:

>    Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified  proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

*S/Martin C.  Carlson*
Martin C. Carlson
United States Magistrate Judge

Dated: March 15, 2010.